Donovan, J.
The plaintiff, Ray Tek Services, Inc. (Ray Tek), filed this action claiming a breach of fiduciary duty (Count II), conversion (Count III) and breach of contract (Count IV) against the defendant, David W. Parker (Mr. Parker) in his individual capacity, d/b/a North Atlantic Imaging. Ray Tek alleges a breach of contract (Count V) against North Atlantic Imaging Systems, Inc. (NAIS). As to both defendants, Ray Tek seeks an accounting (Count I), recovery in quantum meruit (Count VI) and a violation of G.L.c. 93A (Count VII). The parties waived a trial by jury.
Counsel made opening statements, presented evidence through witnesses, exhibits and a statement of undisputed facts. At the conclusion of all the evidence counsel presented final arguments.
FACTS
I find the following facts based on the testimony of the witnesses I deemed credible, the exhibits, undisputed facts and the reasonable inferences drawn from all the evidence.
Ray Tek is a closely held New Hampshire corporation which contracts with hospitals and similar facilities for the sale and repair of medical equipment, particularly x-ray equipment. North Atlantic Imaging Systems, Inc. (“NAIS”) is a closely held Massachusetts corporation. 100% of the shares of NAIS is owned by Mr. Parker. NAIS was the regional distributor for Shimadzu Filmless Cardiac Cath Labs. Other manufacturers of Cardiac Cath Labs such as General Electric and Seimens do not engage distributors but rather *200 perform all the services from sales to repairs with their own employees.
Ray Tek has a contract with York Hospital, York, Maine for the repairs of the x-ray equipment. The contract is of long standing and Ray Tek is well respected by the hospital personnel. Mrs. Mark Johnson, the wife of a co-owner of Ray Tek, is employed at York Hospital as a technician in the cardiac cath lab.
Prior to attending the Radiology Convention in Chicago in December 1997, Mr. Johnson became aware that York Hospital was in the market for a new cardiac cath lab. He was approached to do research on cardiac cath lab equipment and the manufacturers while he was attending the convention. Ray Tek neither sold nor serviced cardiac cath lab equipment. This was a new experience.
Mr. Johnson and his co-owner, Mr. Ralph Polichetti attended the Chicago Convention. Vendors of radiology equipment set up booths and provided attendees information and brochures. Messrs. Johnson and Polichetti decided to look toward vendors of cardiac cath labs who worked through distributors rather than companies like General Electric or Seimens. They were looking down the road at the potential service contract from the hospital. If General Electric or Seimens sold the equipment to the hospital then Ray Tek would not be considered for a service contract because these companies are self-contained. There was an additional incentive. If Ray Tek teamed up and participated in the sale with the distributor there would be a profit on the sale of the equipment.
Mr. Johnson obtained information at the Shimadzu booth. He felt the quality of the product was very good and would be saleable to the folks at York hospital. He was introduced by the Shimadzu representative to Mr. Parker, the distributor for the Maine area. Messrs. Johnson, Polichetti and Parker conversed about a possible lead Ray Tek had for a cardiac cath lab. They discussed the Shimadzu product and setting a date for a future meeting back home. Business cards were exchanged which identified their positions with their respective companies.
In late December/early January a meeting with Mr. Parker was arranged at a local restaurant in Woburn. At the meeting the potential buyer was disclosed to Mr. Parker along with Ray Tek’s belief it had an inside track. Mr. Parker told Mr. Johnson and Mr. Polichetti there were two ways to handle the business venture. If a sale occurred Ray Tek could receive a finders fee or a joint venture could be set up. However, with the latter option the two groups would share all the expenses including the cost of wining and dining the principals at the hospital. Additionally, they would share equally in the profits. All the contracts for the purchase of the equipment could only occur through NAIS. It was further agreed if the joint venture was awarded the contract Ray Tek would have one employee on site during the installation to assist the two employees from NAIS.
The parties discussed the servicing contract. Here the stories diverge. Ray Tek claims Mr. Parker agreed to give Ray Tek the entire service contract but Mr. Parker asserts it was to be split equally and Ray Tek being closer to the hospital would do a first response followed by Mr. Parker’s technicians. No figures were agreed upon nor any further details of the joint venture.
Mr. Parker has experience in the sale and installation of cardiac cath labs. He also is an astute businessman who knew the service contract would be lucrative. Ray Tek’s principals were excited about the prospect of making a profit from the sale of the equipment. Unfortunately, with the emphasis on the sales end of the venture and the profit expectation, Ray Tek did not pursue with Mr. Parker the requirements necessary to prepare Ray Tek to service the equipment. It was Ray Tek’s mistake in believing the agreement to service was not part of the joint venture.
The principals at York hospital were wined and dined, including Mrs. Johnson, by the sales group which included Mr. Parker as lead sales person with Mr. Johnson in an introductory and support role. The technical aspect of the equipment was presented by Mr. Parker.
An on-site visit was arranged for members of the hospital to visit Shimadzu cardiac cath labs in New Jersey and in New Orleans. Ray Tek did not have a representative at the latter location. The cost of the trips, rooming and meals was divided evenly between the joint venturers.
York hospital budgeted One Million Dollars for the lab. There were other companies competing for the contract. When it appeared the contract would be awarded to Seimens, Mr. Johnson requested one last meeting with York hospital. Mr. Johnson left the financial side of the discussions to Mr. Parker who reworked the sale price together with the service contract containing a provision that the first two years of the ten-year contract would be under warranty. At the meeting Mr. Johnson became aware of the reduction in the contract price by $ 130,000.00. The hospital accepted the offer and a contract for the sale of the cardiac cath lab and the service contract was executed fully by April 3, 1998. The contract was drafted by NAIS, Inc. It contained eight pages, the last two pertaining to the service contract. The first and last pages are on letterhead of NAIS, Inc. The drafter of the contract was sloppy because at times reference is made to NAI rather than NAIS or NAIS, Inc. Clearly the parties knew the contract was between York hospital and the corporation, NAIS, Inc., the sole distributor for the Shimadzu cardiac cath lab.
The substantial change in sale price had Mr. Johnson concerned. He asked Mr. Parker several times if *201 there was special pricing for the equipment by Shimadzu. The response was always “no.”
The purchase price of the equipment was $724,000.00. The hospital was obligated to pay the construction costs and NAIS was required to provide the technical specifications and equipment locations to the contractor involved with site preparation and installation. Shimadzu loaned an Alpha Review Station for a period of time but the hospital was required to provide insurance to cover the replacement value.
The service contract costs the hospital $65,000.00 per year beginning on the third year. The first two years were covered by the warranty.
The hospital was delayed in preparing the site for installation. The contract provided if there was a delay of 30 days from the installation date, NAIS had the right to consider the equipment delivered and payment would be due. This provision was invoked because the room was not ready to receive the equipment until November 4, 1998. Installation began on November 24th and was completed with an inspection on January 18, 1999.
In December Mr. Johnson became aware there was special pricing for the equipment. He was quite disturbed because he felt Mr. Parker lied to him. He began demanding an accounting. In fact as early as March 1998 Mr. Parker requested special pricing from Shimadzu. He wrote Shimadzu that his net for the lab with an Alpha Review Station would be approximately $594,000.00 but he wanted a figure of $525,000.00. The fax sent by Mr. Parker on December 23rd to Mr. Johnson with a work sheet of figures has the net at $605,723.00. There were no invoices supporting his figures.
During the installation, Mr. Johnson attended to emergency matters relating to Ray Tek service contracts. As a result there were times no representative of Ray Tek was on the job during installation. Mr. Fred Dowd was the technical specialist, from NAIS who oversaw the installation process. He was involved in working on about 20 cardiac cath labs before the York hospital project. Since his home was in Plymouth, Massachusetts, Mr. Dowd stayed in a motel four nights a week during this period. He was reimbursed for his living expenses.
Mr. Johnson continued to request an accounting supported by the documentation. He was concerned Mr. Parker was cooking the books. He became more concerned in early January 1999 when Mr. Parker presented him with a Non-Disclosure/Non-Compete Agreement (Agreement) to cover the service contract. Failure to sign the Agreement would result in Mr. Johnson not going to Shimadzu in Japan for servicing training on the equipment.
The Agreement was purportedly for the purpose of establishing the terms of the joint venture pertaining to the service contract between Ray Tek and NAIS. The document was drafted by Mr. Parker on NAIS letterhead. Mr. Parker claimed it was required by Shimadzu but other than a recitation to that effect in the Agreement there is no support for such a claim. He asserts the provisions required by Shimadzu were incorporated into the Agreement. Nothing was submitted by Shimadzu setting forth such a requirement. Shimadzu was not a signature on the Agreement. The protections were all one-sided; on NAIS’s side. When. Mr. Johnson protested Mr. Parker suggested he make changes to the Agreement. Changes were made but not accepted. Since this was the first joint venture Mr. Parker was involved in logic dictates there would be correspondence with Shumadzu regarding such an Agreement. I doubt the attorneys for Shumadzu would have misspelled "breach” by using “breech.” In fact Shumadzu did not know of Ray Tek’s involvement. I do not find there was any requirement by Shumadzu that Ray Tek sign any Agreement.
By letter dated September 29, 2000 Shumadzu terminated NAIS as its dealer as a result of a review of “your performance, forecasts, and future business prospects.” As a result Ray Tek’s employee could not be trained in Japan during the warranty period for the service contract.
During the course of the litigation Mr. Parker was compelled to present an accounting. There are seven (7) worksheets with figures, the last dated March 2, 2001 that were sent to plaintiffs counsel. As the accounts were produced and items were challenged the figures were reworked resulting in subsequent work sheets. There is still little supporting documentation for the final accounting. Therefore, pursuant to Mass.R.Civ.P. 53 and Superior Court Rule 49 an Order of Reference shall issue appointing a master tobe paid by the parties to perform the accounting.
DISCUSSION
In every contract there is implied the covenant of good faith and fair dealing. The obligation of “good faith” is an obligation to be honest in fact in dealing with the other side in performance of a contract. The obligation to “fair dealing” is to deal with the other side in a manner that does not improperly deprive the other of the benefits and rewards that the other side anticipated from the contract and would have in fact received if it were not for the other person’s improper conduct. Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471-72 (1991).
A fiduciary relationship involves even a higher duty than parties acting at arms length. A fiduciary relationship is a relationship that arises “where special trust or confidence is placed in one person party by another. The relationship is a voluntary one and arises ‘where one [person] reposes confidence in the integrity of another and the other [person] voluntarily assumes and accepts the confidence.’ ” Reed v. A.E. Little Co., 256 Mass. 442 (1926). A partnership or joint venture is such a relationship.
*202 A fiduciary is not permitted to put himself in a position where his interest is in conflict with the interests of the other party. No self-interest can be allowed to conflict with this responsibility. The rule that a fiduciary may not derive personal advantage at the expense of the other party, nor put himself in a position antagonistic to the other party, will be strictly enforced. Indeed a fiduciary owes the other party the duty of the finest loyalty. Many, forms of conduct permissible in a workaday world for those acting at arm’s length are forbidden to those bound by fiduciary ties. A fiduciary is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. When confidence is reposed and accepted, the person trusted is liable for expressing dishonest opinions upon which the other party relies and acts to his damage, and he is also liable for concealing facts which by reason of the relationship he should disclose. Reed v. A.E. Little Co., 256 Mass. 442 (1926).
The evidence is overwhelming that Mr. Parker not only breached the covenant of good faith and fair dealing but more importantly breached his fiduciary duty. He refused to provide his joint venturer with documentation of costs and expenses. When he finally gave accounting information it was clear he did cook the books. He lied about the special pricing and about Shimadzu’s requirement of a Non-Disclosure/Non-Compete Agreement. Mr. Parker is held liable for the damages flowing from his breach of his fiduciary duty.
Count III for conversion can not be supported because there is a dispute as to the net profit from the sale of the Cardiac Cath Lab to York Hospital. Therefore, this count shall be dismissed.
Count IV is a claim for breach of contract against David Parker individually. The general rule is that a corporation is to be regarded as a separate entity where there is no compelling reason of equity “to look beyond the corporate form for the purpose of defeating fraud or wrong, or for the remedying of injuries.”[1] Id. at 625-26, quoting M. McDonough Corp. v. Connolly, 313 Mass. 62, 65-66 (1943). The corporate veil will be pierced only in “rare particular situations in order to prevent gross inequity.” My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 618-20 (1968). In Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc., 754 F.2d 10, 14-16 (1st Cir. 1985), the Court listed twelve factors to consider in deciding whether to penetrate the corporate form:
(1) common ownership;
(2) pervasive control;
(3) confused intermingling of business activity assets, or management;
(4) thin capitalization;
(5) nonobservance of corporate formalities;
(6) absence of corporate records;
(7) no payment of dividends;
(8) insolvency at the time of the litigated transaction;
(9) siphoning away of corporate assets by the dominant shareholders;
(10) non-functioning of officers and directors;
(11) uses of the corporation for transactions of the dominant shareholders;
(12) use of the corporation in promoting fraud.
Ray Tek has proven some of the factors. It would be a gross inequity not to pierce the corporate veil in light of the conduct by the owner and sole shareholder of NAIS.
Count V is for breach of contract by NAIS. A breach of contract is a failure to perform as required for which there is no legal excuse. NAIS failed to perform when it did not share the pricing information with Ray Tek. It failed to perform by not filing a timely accounting with the joint venturer. That includes the failure to produce invoices where a question arises as to the claimed amount. Only through the litigation was Ray Tek able to force some of the documentation from the clutches of NAIS. NAIS breached the joint venture agreement by failing to properly account with supporting documentation regarding the sale of the cardiac cath lab to York Hospital. Additionally it failed to perform by requiring Mr. Johnson to sign a Non-Disclosure/Non-Compete Agreement which was neither a term of the agreement not a condition precedent to training by Shimadzu.
Ray Tek, however, was unilaterally mistaken when it concluded it was entitled solely to the benefits of the service contract. The entire venture was a joint enterprise. Ray Tek knew that until it was trained in Japan on servicing the equipment the only persons capable of performing the tasks were employees of NAIS. Ray Tek’s inaction in failing from April 1998 until January 1999 to pursue the training is evidence that the servicing contract was a joint venture.
Mutual mistake as set forth in Restatement (Second) of Contracts §152 (1979) provides: “(1) Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake . . .’’In the instant case the mistake as to the parties participating in a joint venture in servicing the equipment was unilateral. As such it cannot be the basis for recession. However, I do find a breach of the servicing contract because NAIS made it impossible for Ray Tek to perform. There was no requirement by Shimadzu that a person seeking training on its equipment execute a Non-Disclosure/Non-Compete Agreement. This was a fiction created by NAIS to eliminate Ray Tek as a future competitor for the service contract.
*203 Count VI is a claim for recovery in quantum meruit. This claim is dismissed because there is a finding of a breach of contract. Recovery, if any, can not be premised in quantum meruit in light of the existence of a contract.
Finally, the count for relief under G.L.c. 93A will be allowed against both defendants. Generally a private, internal grievance does not give rise to an unfair trade or practice. Kurker v. Hill & Others, 44 Mass.App.Ct. 184, 190-91 (1998). However, the conduct of NAIS and David W. Parker was fraught with fraud, lies and deception. The conduct was willful and knowing. Therefore, after the master renders the accounting, I shall hear the parties on multiple damages and attorneys fees.
ORDER

This result may also be achieved through a claim pursuant to G.L. 93A.